## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 7 |
| | : |
| JOHN F. LUBY AND VANESSA LUBY | : |
| | : |
| DEBTOR(S) | : BANKRUPTCY NO. 06-16050 SR |
| | |
| PANDA HERBAL INTERNATIONAL, INC., | : |
| AFAB INDUSTRIAL SERVICES, INC., SVT, INC., | : |
| CAROLINA FULLFILLMENT, EVERETT L. FARR, III, AND | : |
| HENRY HADRY | : |
| | : |
| PLAINTIFF(S) | : |
| | : |
| vs. | : |
| | : |
| JOHN F. LUBY AND VANESSA LUBY | : |
| | : |
| DEFENDANT(S) | : ADVS. NO. 07-0250 |

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

Introduction

In this adversary proceeding, the Plaintiffs seek two measures of relief: first, that

the Debtors be denied their discharge or, alternatively, that the Plaintiffs' claims be

excepted from any discharge which the Debtors might be granted.  The Debtors oppose

both requests and after lengthy, acrimonious pre-trial discovery, a trial was held over

four days.

Summary[1]

Based on the factual findings made herein, the Court will enter judgment in favor

of the Plaintiffs denying the Lubys a discharge pursuant to Bankruptcy Code § 727(a).

Alternatively, the record also supports the Plaintiffs' contention that the following claims

be declared non-dischargeable pursuant to Bankruptcy Code § 523(a) :

| Claim # | Holder | Basis | Amount Not Dischargeable |
|---------|--------|-------|--------------------------|
| 4 | Farr | Converted funds | $130,074.35 |
| 5 | Panda | Trademark Infringement/ Cybersquatting | $216,000 |
| 6 | Farr | Legal Fees | $ 38,264.36 |
| 11 | Panda | Converted equipment | $ 71,500 |
| 13 | Panda | Converted equipment | $ 81,800 |

Factual Background

The Plaintiffs are two individuals[2] and the four business corporations[3] they

control. Among their businesses is Plaintiff Panda Herbal International (Panda). Panda

is in the business of producing and selling herbal supplements. It has been in existence

---

[1] As this matter pertains to discharge of a debtor as well as a determination of dischargeability of claims, it is within this Court's core jurisdiction. *See* 28 U.S.C. § 157(b)(2)(I), (J).

[2] Everett L. Farr, III and Henry Hadry ("Farr" and "Hadry")

[3] Panda Herbal International, Inc., AFAB Industrial Services, Inc., SVT, Inc., and Carolina Fulfillment.

since 1996.  PE I-27.[4] Farr is its sole officer.  Id.  It sells its product online.  Testimony of

Robert Brodie, 4/15/10, 1:56 p.m.[5]  Its trademarks are registered.  PE I-32-36.  It also

operates under the fictitious name "Lenex Labs/ Viable Herbal Solutions."  PE I-28.  In

1996, the Plaintiffs hired the Lubys to run the herbal business from Pennsylvania.  Mr.

Luby's expertise was in computers and so he handled the online operations (J.Luby,

4/19/10, 2:16 p.m.); Mrs. Luby would handle phone sales out of their home in

Pennsylvania.  Brodie, 4/15/10, 1:56 p.m.  As an inducement to the Lubys to take the

job, Farr offered Mr. Luby an option to purchase the business on specified terms.  DE I-

24 Option Agreement.  As to that option, the record reflects that the Lubys never

exercised it and so it lapsed.

     Sometime in 2001, after they became dissatisfied with their employment

arrangement, the Lubys began the process of converting all aspects of the Panda herbal

business.  To that end, they concealed the level of business of Panda and diverted sale

proceeds to themselves.  Farr, 4/16/10, 11:25 - 12:49; PE I -31, 36, 38.  In August

2004 they incorporated Viable Herbal Solutions, Inc., the related Debtor corporation

without Farr's knowledge or consent.  PE I-37.  However, Viable Herbal solutions had

---

[4]Citations to trial exhibits shall use the following abbreviations: "P" shall refer to
Plaintiffs' Exhibit Book, followed by a roman numeral, and then the exhibit number.  "D"
shall refer to Defendants' Exhibit Book.

[5]Citations to witness testimony shall hereinafter begin with the last name of the witness,
the date of their testimony, and the time of their testimony.

already been registered by Farr as a fictitious name in 1999.[6]   PE I-28.  The Lubys

thereafter ceased reporting to Panda any herbal products operations and expenses while

opening secret bank accounts of their own.  Farr, 4/16/10, 12:20 - 12:47; PE I-46, 47.  During

this general time period, they continued to use Farr's credit lines (an American Express

account) to fund, not Panda's, but their own competing operation.  PE I-50, Deposition

Testimony of Vanessa Luby, 84-85; V. Luby 5/3/10, 4:18 to 4:21 p.m.

 In January 2005, Farr became suspicious when he could not reconcile Panda's high

expenses with its sales volume.  Farr, 4/16/10, 12:50 p.m.  He thus demanded an accounting

from the Lubys.  Id.  In particular, he requested expense documentation to justify what were

unusually high expenses charged to Farr's American Express account.  Id.  The Lubys' response

was twofold: first, they ignored the request for information; and second they affirmatively set

out to harm Farr and the other Plaintiffs by doing a number of discrete things.  First, they

stopped payment on a $20,000 check payable to AMEX.  Second, they failed to pay what had

become a $140,000 balance on the AMEX account thereby leaving Farr to pay that himself.  Id.

 In June 2005, the Plaintiffs filed suit against the Lubys and Viable in federal district

court in Philadelphia.  PE I-1  There, they alleged trademark infringement, cybersquatting, and

conversion of assets.  Id.  In December 2006, trial in the trademark litigation case in

Philadelphia occurred.  The jury found in favor of the Plaintiffs and against the Lubys.  PE II-2.

Specifically, the Lubys and their company were found liable for trademark violations and cyber-

squatting.  Id.  Damages were assessed at $200,000 for trademark infringement.  Id.  Before

---

[6]Farr's prior registration of the "Viable Herbal Solutions" name did not create a property
right in it.  See 54 P.S. § 332(a).  Such registration is a means of protecting the public.  12
Summ.Pa.Jur.2d Business Relationships § 5:37.  The Lubys' surreptitious incorporation of a
business by that name is offered as proof of their conversion of Farr's business while in his
employ.

judgment could be entered, however, both the Lubys and Viable filed Chapter 7 bankruptcy

petitions.[7]

Plaintiffs' Contentions

The Complaint alleges that the Lubys' prepetition conduct constitutes actual

fraud and willful, malicious injury as to them, in particular, and dishonesty, generally, as

to the Court, the Trustees and the creditor body.  The Court will take up first the latter

question; i.e., whether the Lubys are entitled to a discharge generally, before analyzing

whether certain debts should be declared non-dischargeable.

Objection to Discharge

Pursuant to § 727(a), an individual debtor will be granted a discharge in

bankruptcy unless the debtor has committed one (or more) of the transgressions

enumerated in that subsection.  The Plaintiffs contend that the Lubys are guilty of

several violations.  They say that the Debtors concealed property from Farr as well as

the Trustee, destroyed financial records, made false statements in their bankruptcy,

failed to explain unaccounted-for assets, violated court orders, and committed

misconduct in this as well as their related corporate case.

---

[7]Judgment would subsequently be entered after Plaintiffs obtained relief from stay to allow the Magistrate Judge to mold the verdict to include statutory damages for the cyber-squatting claim.  That made the total judgment $216,000 ($200,000 for the trademark infringement and $16,000 for the cyber-squatting claim).  See PE II - 4.

Considerations Regarding
Discharge and its Denial

Courts have generally recognized that denial of a debtor's discharge is a harsh

sanction. See In re Gioioso, 979 F.2d 956, 962 (3d Cir.1992).  Accordingly, "[c]onsistent

with the 'fresh start' policy underlying the Code, these exceptions to discharge should

be construed strictly against the creditor and liberally in favor of the debtor." Matter of

Juzwiak, 89 F.3d 424, 427 (7th Cir.1996); Rosen v. Bezner, 996 F.2d 1527, 1531 (3d

Cir.1993) ("Completely denying a debtor his discharge, as opposed to avoiding a

transfer or declining to discharge an individual debt pursuant to § 523, is an extreme

step and should not be taken lightly.")  The elements must be shown by a

preponderance of the evidence by the party opposing discharge.  In re Zimmerman,

320 B.R. 800, 806 (Bankr.M.D.Pa.2005); In re Jacobs, 381 B.R. 147, 159 (Bankr.E.D.Pa.

2008)

Nevertheless, courts have also acknowledged that, "a discharge in bankruptcy is

a privilege, not a right, and should only inure to the benefit of the honest debtor." E.g.,

Matter of Juzwiak, 89 F.3d at 427. Thus, where a debtor has been dishonest in his

dealings with the court or his creditors, it may be appropriate to deny his discharge,

notwithstanding that an underlying goal of federal bankruptcy law is to provide a debtor

with a fresh start. "While the law favors discharges in bankruptcy, it will not ordinarily

tolerate the [debtor's] intentional departure from honest business practices where there

is a reasonable likelihood of prejudice." Kentile Floors, Inc. v. Winham, 440 F.2d 1128,

1131 (9th Cir.1971).

6

Relevance of
the Viable Case

It is dishonest business practices which make up many of the allegations of

objectionable conduct on the Lubys' part.  The Lubys' transgressions, Plaintiffs allege,

occurred not only in their own case, but in the Viable bankruptcy as well.  This is

important because a denial of discharge is not limited to what a debtor may have done

in his or her own bankruptcy case.  Indeed, § 727 will also deny a discharge to the

debtor who has

> [ ] committed any act specified in paragraph (2), (3), (4),
> (5), or (6) of this subsection, on or within one year before
> the date of filing of the petition, or during the case, in
> connection with another case, under this title... concerning
> an insider.

11 U.S.C. § 727(a)(7)(emphasis added).  A leading commentator explains the purpose

of this provision:

> Section 727(a)(7) extends the basis for denial of discharge
> to the debtor's misconduct in a substantially
> contemporaneous related bankruptcy case.  Thus, if the
> debtor engages in objectionable conduct in a case involving
> a relative of the debtor, a partnership in which the debtor is
> a partner, a general partner of the debtor or a corporation of
> which the debtor is an officer, director or controlling person,
> the debtor may be denied a discharge in the debtor's own
> case.  This provision should help induce the cooperation of
> individuals in related bankruptcy cases.

6 Collier on Bankruptcy ¶ 727.10 (emphasis added).  The Court holds that § 727(a)(7)

applies to the Lubys' conduct in the Viable case.

Where the debtor is an individual, the term "insider" includes a "corporation of

which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31)(A)(iv)

(emphasis added).  Here, the Lubys are, of course, both individuals and Viable is their

corporation.  Mr. Luby is without doubt the person in control of Viable (see V.Luby

5/3/10 4:46 p.m.); his wife, according to the Statement of Financial Affairs (SoFA), is

both its CEO and sole shareholder.  PE II-10, SoFA, Question #21.  That makes Viable

an insider of the Lubys.  What this means for present purposes is that if the Court finds

the Lubys concealed property, destroyed records, made false statement or failed to

explain a loss of assets in the Viable bankruptcy case, then that would be the basis for

denying the Lubys a discharge in their own case.  See Tucker v. Devine (In re Devine),

11 B.R. 487, 489 (Bankr. D. Mass. 1981) (debtor who was an insider of a corporation

that had also filed a petition was denied a discharge when the debtor failed to produce

books and records for the corporation).

Concealment

        The Court begins with the contention that the Lubys intentionally concealed

property from both the Plaintiffs as well the bankruptcy trustees.  A discharge will be

denied the debtor who

> with intent to hinder, delay, or defraud a creditor or an
> officer of the estate charged with custody of property under
> this title, has transferred, removed, destroyed, mutilated, or
> concealed, or has permitted to be transferred, removed,
> destroyed, mutilated, or concealed--
>
> (A) property of the debtor, within one year before the date
> of the filing of the petition; or

(B) property of the estate, after the date of the filing of the
petition;

11 U.S.C. § 727(a)(2).  For purposes of denial of discharge, concealment may occur

both before as well after a bankruptcy filing.  Where the concealment of property is at

issue, the Third Circuit has "defined concealment to include preventing the discovery of

or withholding of knowledge of the property."  Applebaum v. Henderson (In re

Henderson), 134 B.R. 147, 157 (Bankr.E.D.Pa.1991) (quoting United States v.

Schireson, 116 F.2d 881,884 (3d Cir.1940)).


Concealment
Prior to Bankruptcy

Plaintiffs allege that the Lubys concealed property prepetition in order to thwart

the Plaintiffs.  A party seeking to bar a debtor's discharge under this subparagraph of §

727(a)(2) must show:

> 1. a disposition of property such as a transfer or
> concealment;
>
> 2. the debtor's subjective intent to hinder, delay, or defraud
> a creditor through that disposition; and
>
> 3. that such act and the debtor's subjective intent occurred
> within the one year period preceding the filing of the
> bankruptcy petition.

See In re Spitko, 357 B.R. 272, 299 (Bankr.E.D.Pa. 2006).

Income

As to prepetition concealment, the Plaintiffs point to evidence that the Lubys

failed to report income earned during the year prior to bankruptcy. On this score, it is

undisputed that they have not filed individual tax returns since 2005.  They similarly did

not file returns for their corporation Viable after 2004.[8]  What matters next is whether

those practices demonstrate an intent to hide income.  Such a state of mind "can be

drawn from a course of conduct." Zimmerman, 320 B.R. at 806.  It may be inferred

from "badges of fraud." In re Rose, 425 B.R. 145, 155 (Bankr.M.D.Pa.2010).  Those

indicia [of fraudulent intent] include: " (1) insider relationships between the parties; (2)

the retention of possession, benefit or use of the property in question; (3) the lack or

inadequacy of consideration for the transfer; (4) the financial condition of the party

sought to be charged both before and after the transaction at issue; (5) the existence

or cumulative effect of the pattern or series of transactions or course of conduct after

the incurring of debt, onset of financial difficulties, or pendency or threat of suits by

creditors; (6) the general chronology of the events and transactions under inquiry; and

(7) an attempt by debtor to keep the transfer a secret; ..." Id. quoting In re Watman,

301 F.3d 3, 8 (1st Cir.2002) (citations omitted).  The Lubys' tax filing practices are

highly suspect: for the fiscal year 2004 Viable had gross sales of $1.3 million (see SoFA,

PE II-10), but the Lubys stopped filing annual tax returns immediately after they

became embroiled in litigation with the Plaintiffs.[9]  The litigation in question resulted in

a judgment followed by a bankruptcy filed the same month.  No plausible explanation

was given for why tax returns were not filed.  The Court concludes that it is reasonable

---

[8]Viable's Trustee retained an accountant to file tax returns for 2005 through 2008.  PE
III - 28 through 31.  The returns state that they are based on incomplete information.

[9]The suit was filed in June 2005.  See DE I-1.

10

to infer that it was done so that the Lubys could conceal property from the Plaintiffs.

Concealment
from the Trustee

It was not only from the Plaintiffs that the Debtors concealed property. Plaintiffs

contend that the Lubys concealed other property from the bankruptcy estate. Section

727(a)(2)(B) of the Bankruptcy Code calls for the denial of a discharge where a debtor,

with an intent to hinder, delay, or defraud creditors or the bankruptcy trustee, has

transferred, removed, destroyed, or concealed property of the estate after the petition

date. 11 U.S.C. § 727(a)(2)(B). Two elements must exist before a discharge may be

denied under this section: (1) an act, such as the transfer or concealment of estate

property; and (2) an improper intent. In re Finney, 333 B.R. 242, 247

(Bankr.W.D.Pa.2005)

What Information
Must be Disclosed?

Commencing a bankruptcy case creates an estate. 11 U.S.C. § 541(a). That

estate consists of, among other things, all legal or equitable interests of the debtor in

property. 11 U.S.C. § 541(a)(1) To that end, it is the debtor's duty to prepare and file

a schedule of assets and liabilities; a schedule of current income and expenditures; and

a statement of financial affairs. 11 U.S.C. § 521(a)(1)(B); B.R. 1007(b). The record

established that the Debtors failed to satisfactorily comply with these requirements.

What Did the Lubys Conceal?

It is appears abundantly clear that the Lubys failed to disclose income.  The first question on the Statement of Financial Affairs (SoFA) requires the disclosure of gross income for the three years prior to bankruptcy as well as its source.  The Lubys did not state what they earned for 2006.[10]  They listed only the income for the previous two years, without ever explaining where that came from.  This raises numerous significant questions, because their business (Viable) had a history generating significant revenue.  As previously noted, the SoFA for Viable listed sales of $1.3 million for the fiscal year ending July 2005, and its tax return declared income of $1.5 million.  See PE I-18.  Viable was a closely-held corporation so its financial condition would obviously impact the Lubys.  Yet, for the 18 months prior to the Luby's bankruptcy filing there is absolutely <u>no</u> documentation as to what income they may have earned during that time period.  Distressingly, this is not a case of incomplete, or incoherent disclosure on a debtor's part: the Lubys have produced absolutely no documentation as to their financial condition or business transactions for the 1½ years prior to bankruptcy.

As to what the Lubys and their business owned on the date of bankruptcy, the level of disclosure is not much better.  Among the items of property which must be listed on Schedule B (Personal Property) is "customer lists."  See PE II-8, Schedule B,

---

[10]The Lubys filed their bankruptcy case on December 28, 2006 and so were required to report income earned from January 1 of that year through the petition date.  The only information which the Luby offer regarding income for 2006 is found in their means test calculation.  There, they disclosed average monthly income of $5000 for the prior six months. *See* PE II-8 (Official Form 22A).

Item #24.  Viable was in the herbal sales business and had a base of customers. On

this score, the Court again emphasizes that Viable's 2004 tax return showed $1.5

million in sales revenue.  PE I-18   Yet, when the Trustee's computer expert—a former

employee of Viable's—tried to recover that information, he could not.  See infra

discussion of § 727(a)(3).  His investigation revealed that someone had altered Viable's

computer records.

Lastly, Plaintiffs point out that Viable's Schedule B failed to disclose internet

domain names which the Lubys registered.  Also known colloquially as a "Web address,"

a domain name is a combination of characters that a person types into a computer

software program called a browser in order to gain access to a Web site, a set of

computer files through which another person provides information over the Internet.[11]

See Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 492-93 (2d Cir.2000).

For commerce, it is an "exclusive vehicle to market products and ideas.  CRS Recovery,

Inc. v. Laxton, 600 F.3d 1138, 1144 (9th Cir. 2010) quoting Patrick T. Clendenen et al.,

Domain Names as Property, in 1 Internet Law and Practice § 17:1, at 17-3 (2009).  To

protect its interest in a domain name, the holder must register the name with an

authorized company (a registrar).  Thus, each domain name is unique and can only be

---

[11]Federal law defines a domain name as "any alphanumeric designation which is
registered with or assigned by any domain name registrar, domain name registry, or other
domain name registration authority as part of an electronic address on the Internet." 15 U.S.C.
§ 1127.

registered to one entity.  Office Depot, Inc. v. Zuccarini, 596 F.3d 696, 698 (9th Cir.

2010) quoting Coalition for ICAAN Transparency v. Verisign, Inc., 464 F.Supp.2d 948,

951-953 (N.D.Cal.2006).  That makes it a species of property.  See CRS, supra, 600

F.3d at 1142 citing Jonathan D. Hart, Internet Law 120 (2008) ("courts generally hold

that domain names are subject to the same laws as other types of intangible

property."); and see Kremen v. Cohen, 337 F.3d 1024, 1030 (9th Cir.2003) (domain

names are intangible property under California law.)  And as such, it must be reported

on a debtor's bankruptcy schedules.  See In re Paige, 2009 WL 3418156 at *4 (D.Utah

October 16, 2009) (upholding bankruptcy court's finding that domain name was

valuable asset of estate); In re Doolittle, 2007 WL 4328804 at *2 (Bankr.N.D.Cal.)

(listing among discrepancies in schedules debtor's failure to list interest in hundreds of

domain names as grounds for denial of discharge); and In re Larry Koenig & Assoc.,

LLC, 2004 WL 3244582 at *6 (Bankr.M.D.La.) (discussing value of internet domain

names)

The Lubys registered over 300 domain names among which was the Arcadia

name under which Viable continued to sell herbals as late as one month before the jury

verdict.  Brodie, 4/15/10, 2:05 p.m.  Notwithstanding, they failed to disclose this or any

of the 300 or so domain names they owned.  It would not be until it was brought to

their attention that they did so.  See PE II - 9 (Amended Schedules).  The Court cannot

accept any claim that the Lubys did not know that such property had to be disclosed.

Considering the Lubys' use of the Arcadia trade name to sell product (see Brodie,

4/15/10, 2:05 p.m.), they unquestionably knew that the domain names had value.  That

makes them material to this case.  It is more than reasonable to infer from these facts

the Lubys' intent to conceal the Arcadia domain name (and others) from the trustee.

The failure to disclose income on their SoFA and to list assets on their Schedule

B cannot be attributed to oversight or other excuse.  What the circumstances suggest is

purposefulness on the Lubys' part.  Income would not be disclosed—and likewise tax

returns would not be filed—as litigation began and resulted in an adverse verdict.  This

served to keep income away from a judgment creditor.  When bankruptcy was

commenced, the Lubys sought to continue to operate their business as if nothing

happened under a different trademark and domain name and with the original book of

business (i.e., customer list).  Brodie, 4/15/10, 2:11-2:13 p.m.  In sum, the Lubys

sought to conceal the necessary parts of their business from both the Plaintiffs as well

as the bankruptcy estate.  All of this alone is grounds for outright denial of their

discharge.

Destruction of
Financial Records

As the next ground for denial of discharge, Plaintiffs charge the Lubys with

having destroyed financial information.  Section 727 will deny a discharge to the debtor

who

> has concealed, destroyed, mutilated, falsified, or failed to
> keep or preserve any recorded information, including books,
> documents, records, and papers, from which the debtor's
> financial condition or business transactions might be

> ascertained, unless such act or failure to act was justified
> under all of the circumstances of the case;

11 U.S.C. § 727(a)(3) (emphasis added).  The Third Circuit has explained

> The purpose of [this provision] is to give creditors and the
> bankruptcy court complete and accurate information
> concerning completeness of the disclosure requisite to a
> discharge. The statute also ensures that the trustee and
> creditors are supplied with dependable information on which
> they can rely in tracing a debtor's financial history. Creditors
> are not required to risk having the debtor withhold or
> conceal assets under cover of a chaotic or incomplete set of
> books or records.

Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir.1992)  If a creditor believes that

the debtor's bankruptcy violates these principles, the creditor must show "(1) that the

debtor failed to maintain and preserve records, and (2) that such failure makes it

impossible to ascertain the debtor's financial condition and material business

transactions." Id. at 1232.  The creditor need not prove that the debtor had an intent to

defraud. See Matter of Juzwiak, 89 F.3d at 430 ("Although the ultimate goal of §

727(a)(3) is to distinguish between the honest debtor, who should be granted the

privilege of discharge, and the abusive or unworthy debtor, who does not deserve such

a benefit, creditors do not need to prove that the debtor intended to defraud them in

order to demonstrate a § 727(a)(3) violation."); In re Senese, 245 B.R. 565, 576

(Bankr.N.D.Ill.2000).  In this case, however, it is not the Lubys financial information

only that is missing, but that of Viable, their corporation.  See In re Spitko, supra 357

B.R. 307- 308 quoting In re Thomas, 2003 WL 21981707, at *11 (Bankr.D.Idaho 2003)

("where the facts indicate that a debtor exercised control over and conducted business

16

through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors.")


Trustee's Attempt to
Obtain Viable's Files

Bonnie Finkel was appointed as the Trustee for Viable's estate.[12] In discharging her duties to administer the estate, Ms. Finkel undertook an inventory of Viable's assets. To that end she retained Robert Brodie, a former employer of the Debtor Viable.  Mr. Brodie had computer expertise and so was retained to inspect the company's computer system.  Mr. Brodie's inspection revealed that some of the computer equipment had been removed and other computer equipment had been rearranged.  See PE II-13 (Brodie Affidavit); PE II-14 (Brodie Transcript 5/10/07, 40-45); Brodie Testimony, 4/15/10, 2:15 to 2:28 p.m.  When he attempted to access the computers on site for customer lists, he could not.  He discovered that file formats had been changed which made those files unrecoverable.  Id.  His investigation of computers which Mr. Luby would later return to the Trustee revealed them to be similarly inaccessible.  Id. Without access to these computer files, the Trustee's accountant was unable to file fully informed and accurate tax returns.  See PE III - 28, 29, 30, and 31 (Form 1120 returns prepared by Trustee's accountant, 2005 through 2008).  In sum, the Plaintiffs have met their burden to show that the Trustee was unable to form an accurate picture of Viable's financial condition when it filed bankruptcy.

_____

[12]Mary Martin was appointed the Trustee for the individual case.

17

The Lubys' Explanation

This evidence shifts the burden to the Lubys to explain why the Trustee could not access the Viable computer files.  See Meridian Bank, supra, 958 F.2d at 1233 ("[O]nce the plaintiff proves that the records produced are insufficient, the burden shifts to the debtor to show that the deficiency is justified.") Chusid v. First Union National Bank, 1998 WL 42292, at *6 (E.D.Pa. January 21, 1998).  When determining whether there is justification, the Third Circuit has instructed, as follows:

> The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice. Depending upon the sophistication of the debtor and the extent of his activities, different record keeping practices are necessary.

Meridian Bank, supra, 958 F.2d at 1231.  Where the debtor is engaged in running a business (as is the case here), the failure to keep or produce any records regarding those transactions may be treated as a violation of § 727(a)(3). See, e.g., In re Cox, 904 F.2d 1399, 1402 (9th Cir.1990); Chusid v. First Union National Bank, 1998 WL 42292, at *6 (denying discharge where "[d]espite [the debtor's] level of [business] sophistication and numerous discovery requests and court orders, the debtor has not produced any documentation substantiating the loss of millions of dollars in assets"). The debtor cannot rely solely on "unsubstantiated oral testimony" regarding his

18

business dealings to satisfy his record-keeping requirement.  Matter of Juzwiak, 89 F.3d

at 429; In re Kearns, 149 B.R. 189, 191 (Bankr.D.Kan.1992) (explaining that although

wrongful intent not required, debtor's actions must have rendered financial condition or

business transaction incapable of ascertainment)  In general, a higher standard of

record-keeping will be imposed upon chapter 7 debtors who are sophisticated business

persons.  See Meridian Bank, supra, 958 F.2d at 1231; Chusid v. First Union National

Bank, 1998 WL 42292, at *6.

That the Lubys sophisticated and competent to run a business is clear from the

record.  After being hired by Mr. Farr, they ran the herbal business in Pennsylvania.

Their success at that venture is demonstrated not only by their revenues, but by their

nearly seamless appropriation of the Plaintiffs' business into their own.  None of this

could be achieved without a significant level of business acumen.  Indeed, these

bankruptcy cases, both individual and corporate, were the result not of

mismanagement, but malfeasance.  By all appearances, the Lubys are sophisticated,

albeit manipulative business proprietors.  Such persons should be able to document

their enterprise's affairs, or at least have a plausible excuse as to why information is

missing.

When pressed to explain what happened to the customer lists, Mr. Luby testified

that he was required to archive customer files every quarter to protect them from

computer hackers.  Defendants Brief, 37; J.Luby, 5/3/10 11:43 a.m.  That, however, is

not what Mr. Brodie found.  Brodie testified that the customer information was not

19

encrypted or otherwise protected but that file formats were changed to make them
unreadable.  The Court credits Mr. Brodie's testimony on this point.  Given Mr. Luby's
expertise with computers (see Farr, 4/16/10, 3:03), the Court concludes that he altered
the information in order to keep it from the Trustee.


Dishonesty Toward
the Trustee and Court

The Plaintiffs next contend that the Lubys' discharge should be denied pursuant
to paragraph (4) of 727(a).  That paragraph denies a discharge to the debtor who

knowingly and fraudulently, in or in connection with the case–

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money,
property, or advantage, or a promise of money, property,
or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to
possession under this title, any recorded information, including books,
documents, records, and papers, relating to the debtor's property or
financial affairs;

11 U.S.C. § 727(a)(4).  Although, they do not specify which subparagraph applies to the
Lubys conduct, it appears from the record that subparagraphs (A) (making a false oath
or account) and (D) (withholding financial information from a trustee) are apposite.

False Oath or Account

To successfully challenge a debtor's discharge under § 727(a)(4)(A), a creditor

must prove that: (1) the debtor made a false oath or statement, (2) the debtor knew the statement was false, (3) the debtor made the statement with the intent to deceive, and (4) the statement was material to the bankruptcy case.  In re Hatch, 2009 WL 3208694 at *8 (Bankr.E.D.Pa. September 30, 2009)  "Section 727(a)(4)(A) is designed to ensure that the debtor puts dependable information in the hands of those interested in the administration of the bankruptcy estate without the need for the trustee or a party in interest to engage in costly, exhaustive investigations to ferret out the truth concerning the Debtor's financial condition." In re Giquinto, 388 B.R. 152, 178 (Bankr.E.D.Pa.2008).

A debtor's failure to list his assets on his bankruptcy schedules can constitute a false oath for purposes of § 727(a)(4).  Hatch, supra citing Cadle Company v. Zofko, 380 B.R. 375, 382 (W.D.Pa.2007).  Plaintiffs point out that the Lubys' schedules failed to list approximately 300 internet domain names.  After this was raised at the 341 meeting of creditors, the Lubys amended the Schedule B in their individual case to reflect those assets.  Plaintiffs' Brief, ¶ 54; PE II - 9 (Amended Schedule B).

The Court discussed, supra, the value of domain names generally.  Considering that the Lubys successfully used the domain name "Arcadia" for herbal sales after the Plaintiff sued them in Philadelphia, they had to know of their value.  That value makes the domain names material to the trustee's ability to fully administer this estate.  To this extent the Debtors' schedules contain false information.

Another untruth is identified in the Lubys' SoFA.  There, they were required to

21

disclose transfers of property made outside the ordinary course of Viable's business and made within the previous two years.  See PE II-8 (SoFA, Question #10).  In November 2005, Viable transferred herbal making equipment to Messrs. Hops and Wykosky, two individuals with whom Mr. Luby had done business in the past.  PE II-12, 13.  The sale provided that Viable would lease back the same equipment.  In essence, then, only the title was conveyed to these third parties.  Because it occurred within two years of the Luby and Viable bankruptcy filings, the sale of that equipment was required to be disclosed on the SoFA.  It was not.  The timing of the transfer is also suspicious: it occurred 5 months after litigation was commenced against the Lubys.  All of this demonstrates to the satisfaction of the Court that the Lubys answered the SoFA falsely in order to hide the equipment.

Withholding of Information

Not only do the Schedules and SoFA contain false information, they likewise lack required information.  Subparagraph (D) of § 727(a)(4) punishes the debtor who withholds information from a trustee.  Item #24 on Bankruptcy Schedule B asks specifically for the disclosure of customer lists.  Here, the Viable customer list was not disclosed on its Schedule B.  When the Trustee sought to recover that information from the Viable computer system, she discovered that the computer files had been irrevocably altered.  Brodie, 4/15/10, 2:15 to 2:30.  Mr. Luby's explanation for why he changed these files is not credible.  J.Luby, 5/3/10, 11:43 a.m.  What the circumstances indicate is that having illegally kept the customer lists and the domain names, he and

22

his wife hoped to resume their operations under a different business name.  In short,

the Court finds that the Lubys withheld valuable information from the Trustee which

they were required to disclose.

Failure to Explain
Loss of Assets

  Plaintiffs based their last challenge to the Lubys' right to discharge on §

727(a)(5).  That paragraph punishes the debtor who "has failed to explain satisfactorily,

before determination of denial of discharge under this paragraph, any loss of assets or

deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).  The

determination of what constitutes a "satisfactory" explanation for the loss of assets in

this context is within the Court's discretion.  In re Mezvinsky, 265 B.R. 681, 689

(Bankr.E.D.Pa.2001).  "In making this assessment, the court does not concern itself

with the propriety of the disposition of the assets, but only whether the explanation is

satisfactory." In re Jacobs, 381 B.R. 147, 168 (Bankr.E.D.Pa.2008).  See also In re

Mezvinsky, 265 B.R. at 690 ("It is important to note that, for the purposes of a §

727(a)(5) inquiry, the court is not concerned with whether the disposition of the assets

was proper under the Bankruptcy Code, but rather only whether the explanation

satisfactorily describes what happened to the assets.").  "Courts in this circuit have held

that the explanation must convince the judge that the explanation is worthy of belief."

In re Jacobs, 381 B.R. at 168. The explanation must appear reasonable such that the

court no longer wonders what happened to the assets." In re Shepherd, 2005 WL

4147868, at *3 (Bankr.D.Kan. Oct. 7, 2005).

The lost assets which Mr. Luby must account for are principally two: income for the years prior to bankruptcy for both debtors and Viable's missing customer list.  To reiterate, the Lubys did not report any income for 2006 on either their Schedule I or the SoFA;[13] neither did they file a tax return for that year.  For Viable, no income is declared after July 31, 2005.  The 2004 return for Viable listed gross income of $1.5 million (see PE I-18) and the company continued to operate until the bankruptcy filing of 2006.  Mr. Brodie testified that the Lubys sold herbals under the Arcadia trade name up until the month before the jury in Philadelphia found them guilty of trademark violations and cyber-squatting (December 2006).  Brodie, 4/15/10, 2:13 p.m.  The Court concludes from that fact that substantial income was most likely earned during the next two years.  Yet, the Debtors have failed to explain what happened to it.  That alone is grounds for denying their discharge.  In re Schachter, 214 B.R. 767, 774 (Bankr.E.D.Pa.1997) (failure to explain missing income bars discharge).

The Lubys offer no better explanation for the missing customer lists.  Such information may have significant value to an estate.  See In re Roco Corp., 701 F.2d 978, 984 (1st Cir.1983) (recognizing value of customer lists when appraising good will); State of N.Y. v. N. Storowski Cooperage Co., Inc., 174 B.R. 366, 376 (N.D.N.Y.1996) (ascribing value to customer lists).  When pressed to explain what happened to those customer lists, Mr. Luby testified that he was acting in the interests of customers'

---

[13]Again, the Lubys disclose average monthly income for the 6 months prior to bankruptcy on their means test form.  See PE II-8.

24

privacy when altering the records post-petition.  He was trying, he explained, to archive

customers information.  J.Luby, 5/13/10 11:43 a.m.  However, Mr. Brodie's testimony

belies that.  Given, as Mr. Brodie testified, that the customer lists have never been

recovered.  the Court ascribes no weight to Mr. Luby's explanation.  The customer

information would appear to be missing for other more sinister reasons.  The Court, in

short, finds Mr. Luby's explanation of what happened to the Viable customer lists to be

untruthful.


Violation of
Court Order

Plaintiffs' last ground for denial of discharge alleges a refusal on the Lubys' part

to obey an order entered by the District Court at the conclusion of the Panda trademark

litigation.  Paragraph (6) of 727(a) will deny a discharge where "the  debtor has

refused, in the case--  to obey any lawful order of the court, other than to respond to a

material question or to testify...." 11 U.S.C. § 727(a)(6).  See In re Spielberg, 2007 WL

915860 *4  (Bankr.E.D.Pa. March 23, 2007) (discharge denied for failure to comply with

lawful order of court).  Thus, to deny a debtor a discharge under section 727(a)(6)(A)

four elements must be met: 1) the court issued an order directed at the debtor; 2) the

order was lawful; 3) the order did not require the debtor to respond to a material

question or to testify; and 4) the debtor refused to obey the order.  In re Klika, 2007

WL 842073 *2 (Bankr.D.Del.March 16, 2007)

After the Jury Verdict in Plaintiffs' favor (December 5, 2006), Magistrate Judge

Hart entered a Memorandum and Order directing the Lubys to turn over to the Plaintiff

all documentation related to herbal supplements they made or sold when they violated

the Panda trademark.  See PE II-4 (January 7, 2006 Memorandum and Order).  That

order, however, was entered about two weeks after the Lubys commenced their

bankruptcy case.  The record does not say if the district court was apprised of the

bankruptcy filing.  In any event, such order was stayed by the bankruptcy filing.

Consequently, such order would be void and, in turn, unlawful.  Plaintiff, however,

sought relief from the bankruptcy stay to enforce the District Court verdict.  On April 3,

2007, this Court entered an order granting relief and, importantly, adopted the District

Court Judge's findings of fact and conclusions of law.  See PE II-7  That order of the

Bankruptcy Court—an order which incorporated by reference the directive to the Lubys

to turn over specified documentation—was lawful.[14]

Mr. Farr testified that the Lubys never complied with that order.  Farr, 5/3/10,

4:40-42 p.m.  Mr. Brodie corroborated that testimony to the extent of his investigation

of the state of the Viable computer records.  Brodie recalled his attempts—at the

Trustee's request—to recover Viable's business records both from the computers on site

as well as those subsequently returned to Trustee's Counsel.  The files, Mr. Brodie

explained, were either altered or missing outright, thus leaving the Trustee with no

information from which she could ascertain Viable's financial condition.  The

circumstances (e.g., the Lubys' failure to file tax returns for 2006; failure to disclose

---

[14]Moreover, it did not involve questioning or testimony.

26

recent income in their bankruptcy schedules) suggest that their refusal to comply with

the District Court order was purposeful: they sought to hide the extent of their

conversion of Plaintiff's business in order to operate their own herbal entity.  See PE II -

4 (District Court's Memorandum and Order explaining that this trademark case was

"essentially" a "business dispute" and that the jury found that the business belonged to

the Plaintiffs).  The Lubys violation of the that order constitutes independent grounds

for the denial of their discharge.  See In re Reed, 293 B.R. 65

(Bankr.D.Kan.2003)(denying discharge for failure to comply with court order).

Summary of § 727 Ruling

The Court finds that the evidence supports Plaintiffs' claim that the Lubys'

conduct violated subsections (a)(2), (a)(3), (a)(4), (a)(5), (a)(6) and (a)(7) of § 727.

The Lubys concealed property from a judgment creditor and the trustee, concealed or

destroyed material, relevant financial records of their corporation, failed to disclose

assets and information in their Schedules and Statement of Financial Affairs, withheld

potentially valuable assets from the trustee, offered false explanations for why

particular assets were missing, violated a court order, and did so in this bankruptcy case

as well as their related corporate case.  Regrettably for them, but as a result, the record

rather overwhelmingly supports outright denial of a discharge in this bankruptcy case.

Non-Dischargeability of
the Plaintiffs' Claims

Although the Court has found that the Plaintiffs have demonstrated that outright

denial of discharge is warranted, they have pleaded an alternative, more limited, theory

of relief.  They maintain that their Proofs of Claim should be excepted from discharge

pursuant to § 523.  The operative subsection which they cite is § 523(a)(6) which

provides that "[a] discharge under section 727... of this title does not discharge an

individual debtor from any debt– ... for willful and malicious injury by the debtor to

another entity or to the property of another entity." 11 U.S.C. § 523(a)(6)[15]  This type of

claim generally relates to torts and not to contracts.  4 Collier on Bankruptcy ¶

523.12[1].   By its terms, it may apply to a broad range of harmful conduct.  Id.  To fall

within this exception, the injury must have been both willful and malicious.  Each state

of mind is distinct: willfulness entails deliberation or intent; malice usually involves

personal animus, spite, or ill-will.  Plaintiffs contend that from the Debtors' conversion

of nearly every aspect of the Panda business to the fomenting of litigation by a third

party against them in another jurisdiction, the intent to put Panda out of business and

cause the individual Plaintiffs financial harm was clear.  The Court will analyze each of

the Plaintiffs' claims to determine if each is the result of purposeful harm perpetrated by

the Lubys.[16]

---

[15]Plaintiffs also cite § 523(a)(2) (actual fraud) as applicable to the Lubys' conduct, they
never developed the elements of that claim in the record.  The thrust of their case is
intentional, personal harm directed at them by the Lubys.  As will be seen, such claims are well
made.

[16]Although the Plaintiffs and the Trustee stipulated in the main case to a total allowed
claim amount for all of the Plaintiffs' claim (see Stipulation, July 21, 2009), that did not affect
Plaintiffs' right to seek non-dischargeability of any particular claim.  Id. ¶6.

Claim #4 - Conversion
of Funds and Resulting
American Express Delinquency

Plaintiff Farr has filed a Proof of Claim in the amount of approximately

$130,000.00.  The claim derives from an American Express charge account for which he

was responsible and to which he granted the Lubys charging privileges.  According to

Farr, the account was to be used by the Lubys for business expenses related to Panda.

Charges were to be paid by the Luby's from earnings generated from herbal sales.

There came a time when Farr questioned the level of charging on the account.  Farr

4/16/10, 12:52.  His suspicions caused him to file suit against the Lubys.  After Farr had

filed suit against the Lubys, by their own admission, the Lubys retaliated by stopping

payment on a check payable to AMEX and altogether not paying the bill.  V.Luby,

5/3/10, 4:18 pm. That caused AMEX to close that account as well as others Farr had

with AMEX.  Farr, 4/16/10, 12:53.  Farr remained liable on that delinquent account

which he paid off over time.  Farr, 4/16/10, 3:52 to 3:58; PE III - 13 through 20.  In

this bankruptcy, that claim constitutes damages for funds converted by the Debtors.

The classic, common law definition of conversion under Pennsylvania law is "the

deprivation of another's right of property in, or use or possession of, a chattel, or other

interference therewith, without the owner's consent and without lawful justification."

McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n. 3 (Pa.Super.2000).  Claims

of conversion have been held to constitute willful and malicious injury for purposes of §

523(a)(6).  See, e.g., In Matter of Luce, 960 F.2d 1277, 1283 n.8 (5th Cir. 1992); In re

Himber, 296 B.R. 217, 225 (Bankr.C.D.Cal.2002); In re Feiner, 254 B.R. 266

(Bankr.D.Kan.2000); and In re Derensinski, 216 B.R. 995 (Bankr.M.D.Fla.1998).

The revenue from sales that should have gone to pay the AMEX charges was

used by the Lubys in defending themselves against Farr's lawsuit against them.  This

was admitted by Mrs. Luby in her deposition and again at trial.  PE I - 50 (Deposition of

V. Luby @ 84-85); V. Luby 5/3/10, 4:18 to 4:21 p.m.  That Mr. Farr sustained injury as

a result of this decision is demonstrated: he testified that he paid off the entire AMEX

balance over time.  PE III-13 through 20 (AMEX account statements); Farr, 4/16/10

3:52 - 3:58 p.m.  The Court finds that the Lubys conduct was done deliberately and

with obvious intent to harm Farr.  They were retaliating against Farr for filing suit

against them.  Accordingly Proof of Claim #4 will be declared non-dischargeable.


Claim #5 Trademark Infringement/
Improper Domain Name Registration

Plaintiff Panda filed Proof of Claim #5 in the amount of $216,000.00.  This claim

is based on a judgment entered in its favor against the Lubys and Viable in the federal

court litigation.  About 1½ years before these bankruptcies were filed, these same

Plaintiffs had sued the Lubys and Viable alleging trademark infringement and internet

domain name (a/k/a "cyber-squatting") violations.  The Plaintiffs received a jury verdict

in their favor on both counts.  The jury assessed damages for the trademark violations

at $200,000.00 and a subsequent ruling awarded them an additional $16,000.00 for

violations of the federal anti-cybersquatting law.

30

The Plaintiffs maintain that the entry of judgment in the federal court litigation has preclusive effect in this proceeding.  See Plaintiffs' Post-Trial Brief, 24, ¶ 84.  The Lubys are collaterally estopped, they say, to challenge the contention that trademark and domain-name violations give rise to non-dischargeable debts here.  Id. The Lubys dispute this.

Collateral Estoppel

Sometimes referred to as issue preclusion, collateral estoppel "prevents the relitigation of issues that have been decided in a previous action."  Hawksbill Sea Turtle v. Federal Emergency Management Agency, 126 F.3d 461, 474 (3d Cir. 1997).  See also Hitchens v. County of Montgomery, 2004 WL 886266 *4 (3d Cir.) (quoting Montana v. United States, 440 U.S. 147, 153 (1979)) ("Issue preclusion ensures that 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'").  "Issue preclusion is based upon the policy that 'a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise.'" Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 547 (3d Cir. 1996) (quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991)).  See also Hitchens, supra  ("The doctrine [of issue preclusion] derives from the simple principle that later courts should honor the first actual decision of a matter that has been actually litigated.").  As the Third Circuit explained "[t]he doctrine of issue preclusion reduces

31

the costs of multiple lawsuits, facilitates judicial consistency, conserves judicial

resources, and 'encourage[s] reliance on adjudication.'"  Dici, 91 F.3d at 547 (quoting

Allen v. McCurry, 449 U.S. 90, 94 (1980)).  The general rule is that issue preclusion

applies if the following four factors are met: (1) the issue sought to be precluded is the

same as that involved in the prior action; (2) the issue was actually litigated; (3) there

was a valid and final judgment; and (4) the determination was essential to the prior

judgment. National Railroad Passenger Corp. v. Pennsylvania Pub. Util. Comm'n, 288

F.3d 519, 525 (3d Cir. 2002).

Preclusive Effect of the
Cyber-Squatting Verdict

        The Court begins with the claim that the cyber-squatting verdict is entitled to

collateral estoppel.  To see if there is an identity of issues between what constitutes

that offense and whether it constitutes willful, malicious injury, the Court must

determine in the first instance what makes up cyber-squatting.  One court describes it

as the "deliberate, bad-faith, and abusive registration of Internet domain names in

violation of the rights of trademark owners." Virtual Works, Inc. v. Volkswagen of Am.,

Inc., 238 F.3d 264, 267 (4th Cir.2001) (quoting S.Rep. No. 106-140, at 4 (1999)).

Cyber-squatters register "'well-known brand names as Internet domain names' in order

to force the rightful owners of the marks 'to pay for the right to engage in electronic

commerce under their own brand name.'" Id. (quoting S.Rep. No. 106-140, at 5).

Cybersquatting has been described as "the Internet version of a land grab." Interstellar

Starship Servs., Ltd. v. Epix, Inc., 304 F.3d 936, 946 (9th Cir.2002).

The Anti-Cybersquatting Protection Act (ACPA) makes it illegal to register or use

with the bad faith intent to profit an Internet domain name that is "identical or

confusingly similar" to the trademark or domain name of another person or company.

15 U.S.C. § 1125(d)(1)(A).  The ACPA defines a "cybersquatter" as one who

> (i) has a bad faith intent to profit from [a mark]; and
> (ii) registers, traffics in or uses a domain name that-
> (I) in the case of a mark that is distinctive at the time of
> registration of the domain name, is identical or confusingly
> similar to that mark;
> (II) in the case of a famous mark that is famous at the time
> of registration of the domain name, is identical or
> confusingly similar or dilutive of that mark....

15 U.S.C. § 1125(d)(1)(A) (emphasis added).  Important for present purposes is that

"bad faith" is an essential element of the ACPA.  Interstellar Starship, 304 F.3d at 946.

In determining whether a person has "bad faith intent," Congress directed the courts to

consider the following nine nonexclusive factors:

> 1. The trademark or other intellectual property rights of the
> person, if any, in the domain name;
> 2. The extent to which the domain name consists of the
> legal name of the person or a name that is otherwise
> commonly used to identify that person;
> 3. The person's prior use, if any, of the domain name in
> connection with the bona fide offering of any goods or services;
> 4. The person's bona fide noncommercial or fair use of the
> mark in a site accessible under the domain name;
> 5. The parties intent to divert customers from the mark
> owner's online location to a site accessible under the domain
> name that could harm the goodwill represented by the mark,
> either for commercial gain or with the intent to tarnish or
> disparage the mark, by creating a likelihood of confusion as
> to the source, sponsorship, affiliation, or endorsement of the

33

site;
6. The person's offer to transfer, sell, or otherwise assign
the domain name to the mark owner or any third party for
financial gain without having used, or having an intent to
use, the domain name in the bona fide offering of any goods
or services, or the person's prior conduct indicating a pattern
of such conduct;
7. The person's provision of material and misleading false
contact information when applying for the registration of the
domain name, the person's intentional failure to maintain
accurate contact information, or the person's prior conduct
indicating a pattern of such conduct;
8. The person's registration or acquisition of multiple domain
names which the person knows are identical or confusingly
similar to marks of others that are distinctive at the time of
registration of such domain names, or dilutive of famous
marks of others that are famous at the time of registration of
such domain names, without regard to the goods or services
of the parties; and
9. The extent to which the mark incorporated in the person's
domain name registration is or is not distinctive and
famous....

15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).  In addition to the nine enumerated factors, a

court may rely on other indicia of bad faith intent to profit.  Sporty's Farm, L.L.C. v.

Sportman's Mkt., Inc., 202 F.3d 489, 499 (2d Cir.2000) (stating that "[t]he most

important grounds for [a finding of bad faith intent] are the unique circumstances of

th[e] case, which do not fit neatly into the specific factors enumerated by Congress but

may nevertheless be considered under the statute").  The ACPA also contains a safe

harbor provision explaining that bad faith intent "shall not be found in any case in which

the court determines that the person believed and had reasonable grounds to believe

that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. §

1125(d)(1)(B)(ii).  Why this analysis of bad faith matters for present purpose is for its

34

similarity to willful and malicious intent.  Bad faith and malice are essentially the same

state of mind: both intend harm.  So any finding of an injury caused by cyber-squatting

the Plaintiffs' trade names would also constitute a willful and malicious injury under §

523(a)(6).  See In re Chaires, 249 B.R. 101, 106 (Bankr.D.Md.2000) (finding bad faith

to equate with willfulness and maliciousness for purposes of 523(a)(6)); see also In re

Wright, 355 B.R. 192, 212 (Bankr.C.D.Cal.2006) (concluding that once bad faith found

for purposes of ACPA, resulting injury within scope of § 523(a)(6)).  There is an identity

of issues as between the jury verdict as to the cyber-squatting and the instant claim

that the cyber-squatting was done with the intent to harm the Plaintiffs.  The Court also

finds the other elements for issue preclusion to be present: the ACPA claim—including

the requisite mental state was actually litigated as demonstrated by the trial verdict.  A

valid and final judgment was entered.  See PE II - 2, 4 (Jury Verdict Sheet and

Magistrate Judge's Order molding judgment.)  A verdict of liability for cyber-squatting

necessarily involves a finding of bad faith on the Lubys' part.  Based on this record, the

Debtors are estopped from challenging the claim that the cyber-squatting damages are

not like willful and malicious injury.

Preclusion and the Effect
of the Trademark Verdict

The same finding, however, is not supported as to the Lubys' trademark

violations.  Collateral estoppel would not be appropriate as to that claim because they

do not share the same elements.  To see the difference, an analysis of the basic

principles underlying federal trademark law is in order.  The body of law applicable to

trademarks is the Lanham Act, 15 U.S.C. §§ 1051 et seq.  It seeks to protect both an

owner's investment in a mark as well as consumers who have formed an association

with the mark.  See Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 163-64, 115

S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995).  Liability for trademark or service mark

infringement occurs when, without consent, a person "use[s] in commerce any

reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection

with the sale, offering for sale, distribution or advertising of any goods or services on or

in connection with which such use is likely to cause confusion, or to cause mistake, or

to deceive." 15 U.S.C. § 1114(1)(a).  Trademark infringement is established if the

plaintiff demonstrates (1) ownership of a valid, protectable mark, and (2) a likelihood of

confusion, mistake or deception in the defendant's use of the mark.  See Opticians

Ass'n of Am. v. Opticians of Am., 920 F.2d 187, 192 (3d Cir.1990).  The essential

element of trademark infringement is the likelihood of confusion, i.e., whether the

similarity of the marks is likely to cause confusion as to the origin, sponsorship, or

approval of goods or services.  Century 21 Real Estate Corp. v. Lendingtree, Inc., 425

F.3d 311, 321 (3d Cir. 2005) To prove likelihood of confusion plaintiffs must show that

the consumer viewing the mark would probably assume that the product or service it

represents is associated with the source of a different product or service identified by a

similar mark.  Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 182 (3d Cir.

2010)

The plaintiff who alleges trademark infringement is not required to prove bad faith or malice on the infringer's part.  Fraudulent or wrongful intent is not an essential element.  See Sabinsa Corp., supra, 609 F.3d at 187.  In other words, a lesser standard for the state of mind requirement prevails for a trademark infringement action.  If that standard is less than what is required for willful malicious injury, then there is no identity of issues as between the two causes of action.  Indeed, this is demonstrated by the District Court Verdict Sheet offered as an exhibit in this trial.  It shows that the jury necessarily must have found that the Plaintiffs had valid marks which were infringed upon (see PE II - 2, Verdict Sheet, ¶ 1.)  But there is no finding in the district court record that the infringement was the product of ill-will, bad faith, or other personal animus.  The jury found only that the Lubys' infringement was committed with knowledge that their misuse of the Plaintiffs marks was intended to cause confusion or mistake or in order to deceive.  Id.  That intent is directed towards the public; it may or may not be intended to harm the holder of the mark.  For that reason, the Plaintiffs' trademark claim will rise to the level of willful and malicious based only on the evidence in the record before the Bankruptcy Court, not what might have been found by the district court jury.  Does the record show that Debtors' infringement was done to confuse the public?  Or was it aimed at doing real harm to the Plaintiffs, the owners of the marks?

The Court finds it to be the latter.  From 2001 onward, the Lubys set about to convert Panda's business.  They diverted its revenues (see PE I - 46, 47 and 48; Farr

4/16/10 12:17 to 12:47), infringed upon its intellectual property (PE II - 2,4), and

sabotaged its credit lines.  Farr, 4/16/10 12:53.  When the Plaintiffs filed suit, Mr. Luby

responded by surreptitiously inducing a competitor of the Plaintiff to sue the Plaintiff in

a different forum.  The latter tactics constituted an abuse of legal process.  Moreover,

this continued after the Lubys filed their bankruptcy, as they at first failed to turnover

all of the domain names which they registered.  See PE II - 9.  The totality of their

conduct toward the Plaintiffs more than reasonably allows the inference that whatever

action they took with regard to any item of Plaintiffs' property was taken with malicious

intent.  Thus, while the District Court record might not necessarily reflect willful or

malicious intent as to the Plaintiffs' trademarks, the record herein does.  Accordingly,

the Court finds that the Lubys' infringement of Panda's trademark infringement was

willful and malicious injury for purposes of § 523(a)(6).

        As a consequence, the Court finds that the entire amount of the District Court

judgment ($216,000) is non-dischargeable under § 523(a)(6).


Claim ## 6 - 10 Legal Fees
Incurred in Defending
Georgia Litigation

        Proofs of Claim ## 6 through 10 were each filed in the same amount and on the

same basis: instigation of litigation.  They represent legal fees incurred by these

claimants in defending themselves in a lawsuit filed against them in Georgia.  The

Lubys' role in that litigation was particularly calculating and nefarious:  they were not

parties to the lawsuit, but Mr. Luby, was primarily responsible for instigating it.  He

convinced the plaintiff in that litigation (an herbal supplement manufacturer named Hi-Tech Pharmaceuticals) that Farr and Hadry were counterfeiting its product.  This led Hi-Tech to sue the Plaintiffs (except for Panda) in Georgia federal court.  After 4 years and over $38,000 in legal fees and costs (see PE III-9, 23), the case against the Plaintiffs would be dismissed.

To appreciate how the Luby's role in that suit rises to the level of willful and malicious harm as to these plaintiffs, one must consider his motivations: Mr. Luby was by no means acting out of a sense altruism when he contacted Hi-Tech.  To the contrary, his purpose in contacting Hi-Tech was purely selfish: he was retaliating against Farr and Hadry because they had sued him and his wife in Philadelphia.  His principal tactic was an anonymous memorandum (oftentimes referred to in these proceedings as the "Luby Memorandum"). It advised Hi-Tech that Farr and Hadry had been counterfeiting its herbal product.  See PE III - 20.  What follows in that writing, however, is hardly even that benign.  The Luby Memorandum is as singular a "smoking gun" document as ever might be imagined. It is extraordinarily illuminating as to the Lubys' motivations, not just with respect to the Georgia litigation, but with respect to their overall vendetta against the Plaintiffs.  It contains pages of personal attacks on Farr and Hadry as well as various individuals associated with their businesses.  The memorandum recounts the alleged history of how Farr and Hadry sought to take advantage of Hi-Tech's legal problems with the FDA and take away Hi-Tech's market share by selling a counterfeit product.  It lists and paraphrases the contents of about

150 emails sent between June 2003 and February 2005.  These communications were written for the most part by either Farr or Hadry and addressed to the other.  Others were sent by or are addressed to third-parties allegedly associated with the Plaintiffs' enterprise.  The entire collection of emails appears to have been purloined by Mr. Luby. Clearly, the emails were taken from Panda's computer system without the consent of Farr.[17]  The Luby Memorandum purports to leave to Hi-Tech the decision of whether to file suit or not, and disingenuously disclaims any interest in the matter except to say that the writer simply "[doesn't] like Farr or Hadry."  See generally id.

The malicious nature and the effectiveness of the Luby Memorandum can scarcely be overstated.  Counsel for Hi-Tech, a Mr. Novotny, explained to the District Court Judge in Georgia that it formed the basis of the Hi-Tech suit against Farr and Hadry.  PE III-10.  That suit alleged RICO claims (federal and state), trademark infringement (federal and state), and tortious interference with business relations.  PE I-2.  While Farr and Hadry would eventually agree to cease infringing upon the trademark of Hi-Tech's product (see Consent Order, PE III-21), no finding of liability would ever occur and the case was ultimately dismissed for lack of prosecution.  Id., PE III - 22.  In defending themselves, Farr and Hadry incurred legal fees of over $38,000.00.

While they do not entitle it as such, the Plaintiffs' theory, insofar as the Luby Memorandum and the emails are concerned, is akin to what was known at common law

---

[17]The witness Robert Brodie also testified that his inspection of Mr. Luby's computer revealed no emails after May 9, 2006.  Brodie 4/15/10, 2:22 p.m.

as barratry.  That is defined as the "vexatious incitement to litigation."  Black's Law

Dictionary (8th ed. 2004);  In re McClure, 430 B.R. 358, 364  (Bkrtcy.N.D.Tex.2010)

(defining the offense).  In Pennsylvania, it rises to the level of a crime.  See 18 U.S.C. §

5109 ("a person is guilty of a misdemeanor of the third degree if he vexes others with

unjust and vexatious suits.");  Commonwealth v. Lewis, 453 A.2d 982, 985, 307

Pa.Super. 468, 475 (Pa.Super.1982) (finding wife's suits against ex-husband to

constitute harassment and citing barratry statute).  Despite his protest to the contrary,

Mr. Luby was not acting to further justice: his unmistakable intent was to harm the

Plaintiffs by subjecting them to ruinous litigation.  He never hid what was a personal

animus held as to both Farr and Hadry.  Their legal bills of $38,264.36[18] are the harm

that they sustained as a result of Mr. Luby's willful and malicious conduct.


Claim #11 - Panda's
Converted Property

Proof of Claim # 11 was filed by Panda in the amount of $71,500.00.   It

constitutes the sum it paid the Trustee to recover the equipment, intellectual property

and other personalty of Panda's which the Lubys, through Viable, converted prepetition.

The Plaintiffs argue that their claim of conversion is proven by the District Court jury's

verdict.  To reiterate, the jury found that Viable was guilty of both trademark

infringement as well as cyber-squatting.  However, no such finding was made as to

physical equipment which is involved in this claim.  There must be independent proof in

---

[18]The balance of $117.553.00 is alleged to be a potential liability to another defendant in
that litigation, Anything Distributors, Inc.  Because that claim is contingent, it will not be allowed.

this record that such equipment was always the property of Panda, not Viable.

Although there are no documents of title (i.e., bills of sale) demonstrating Panda's

ownership of the property, Plaintiffs offer other evidence which is probative. Farr

testified that he is the owner of Panda. Farr, 4/16/10, 10:50 a.m. The parties also

executed an Option Agreement in September 2001. That agreement envisioned a

transfer of Panda's assets to Luby sometime within the ensuing four years. See DE I-24

(Option Agreement). The Magistrate Judge's Order likewise found that the trademark

litigation was more akin to a business dispute and that the business essentially

belonged to the Plaintiff. PE II-4, p.4. And when Viable filed its Chapter 7 case, the

Plaintiff pressed its claim to this very same equipment, a claim which perforce ended up

being adjudicated in the Viable bankruptcy estate. Although Panda maintained that it

owned the hard assets of Viable's estate, it agreed to pay the Trustee $71,500.00 for

those assets. See PE II-15, Ex. A (Panda's offer to Trustee); see also Farr, 4/16/10

3:34 to 3:40 p.m. For their part, the Defendants never introduced any evidence

showing that Viable, their corporation, owned the equipment. Therefore, the Court

concludes that regardless of the fact that Farr paid for property which he said he

already owned, the preponderance of the evidence demonstrates (1) that the property

was always his and (2) that the Lubys converted such property.

Claim #12 - AFAB
Converted Equipment

Proof of Claim #12 was filed by the Plaintiff AFAB Industrial Services in the

amount of $40,000.  It is also is based on the alleged conversion of equipment by the

Lubys.  Because the Trustee has abandoned any interest in this equipment, AFAB has

greed to withdraw this Proof of Claim.  Trial Transcript, 4/16/10 3:58 (colloquy

between Plaintiffs' counsel and court)

Claim #13 - Panda
Equipment Sold to
Hops and Wykosky

Proof of Claim #13 is the last claim for which non-dischargeability is sought.  It

was also filed by Panda and is in the amount of $81,000.00.  It involves equipment

which the Lubys—through Viable—sold to two third parties in November 2005.  PE II -

11, 12.  The documentation attached to the claim shows that Viable sold certain

specified equipment to Messrs Hops and Wykosky for $81,000.00 but that Viable then

leased back the same equipment.  Id.  Once again, Panda contends that this constitutes

a transfer of its property, not the Lubys.  Its case is convincingly made with the same

evidence that supported its entitlement to the property in Proof of Claim #11, supra.

Moreover, the Court notes that the sale/leaseback occurred six months after the

plaintiffs had filed suit against the Lubys and Viable; that this involves a bulk transfer

(i.e., outside the ordinary course of business; that such transfer was not disclosed in

the SoFA; and that Hops and Wykosky are former business associates of Mr. Luby).

Faced with these circumstances, the Defendants offer no satisfactory explanation as to

how the equipment in question nevertheless belonged to them.  Accordingly, the Court

finds that they converted Panda's equipment with both willful and malicious intent for

43

purposes of § 523(a)(6).


Summary of the
Non-Dischargeability
Claims

Proofs of Claim ## 4, 5, 11, and 13 will be declared non-dischargeable for the

reasons stated above.  Claim #12 has been withdrawn.  As to Proofs of Claim ##6

through 10, the Court finds them to make the same demand for the same relief.  They

are thus duplicative of each other.  The Court has found that to the extent not

dischargeable, such claims are for legal fees in the Georgia litigation in which they were

all defendants represented by the same counsel.  Total legal fees and costs were

proven to be $38,264.36 and that amount will be declared non-dischargeable as to

Claim #6 only.


Conclusion

As set forth at the outset of this Opinion, the Plaintiffs have established a case

for the denial of a discharge to the Lubys.  They have similarly met their burden of

proof insofar as establishing their entitlement to the exception of the bulk of their

claims from any discharge which might otherwise have been granted to the Lubys.  As

discussed herein, the case against the Lubys on the various issues at bar was, in certain

respects, overwhelming.

In reaching its determination the Court is not unmindful that the issues must be

considered separately as to Mr. Luby and Mrs. Luby.  In this respect the record is not entirely clear, but it is more than sufficiently so.  Mr. Luby appears to have been the primary "actor" when it came to warring with the plaintiffs.  There is ample evidence, however, that Mrs. Luby was herself oftentimes an affirmative participant in the relevant misdeeds (false oath, housing converted property, diverting corporate monies to fund personal litigation expenses), and at all times a willing accomplice to the couple's campaign.  Accordingly, the Court's conclusions as to a denial of discharge under Bankruptcy Code § 727 and dischargeability of debt under Bankruptcy Code § 523 apply jointly to both of the Lubys.

In closing, the Court acknowledges its recognition that the Lubys view themselves as the victims of the saga detailed in this Opinion.  The Court notes, in passing, the evidence which reflected that before their relationship soured the Lubys and the individual Plaintiffs were close personal friends.  It is the Court's sense that this facet of the case perhaps best explains the egregiousness of the Lubys' conduct both before and after their bankruptcy filings.  That said, the Court hastens to add that there is a vast difference between an explanation and an excuse, at least for present purposes.  Whatever their mindset and purported justification, the Lubys are fairly charged with the misconduct they engaged in.  Neither the Bankruptcy Code, nor the Bankruptcy Courts exist for the purpose of enabling debtors to pursue schemes designed to exact revenge.  If there is a moral to this unfortunate story, it would be that.

An appropriate Order follows.

By the Court:

Stephen Raslavich
Chief U.S. Bankruptcy Judge

Dated: September 30, 2010